IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DEBORAH L. GOGEL, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. GLR-16-2695 |
| JOHN MAROULIS, et al., | * | |
| Defendants. | * | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants John and Paula Maroulis' (collectively, "the Maroulises") Motion for Summary Judgment (ECF No. 95). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant the Motion in part and deny it in part.

## I.    BACKGROUND

### A.    Factual Background

This case arises from the death of William M. Gogel, Jr. ("Gogel") and Fredy F. Castro ("Castro") on August 5, 2013, while they were passengers on a boat owned by the Maroulises and operated by John Maroulis.

On August 4, 2013, the Maroulises hosted their friends Konstantinos Balourdos, Castro, Gogel, and Gogel's wife and daughter for dinner at their home in Ocean View, Delaware. (J. Maroulis Dep. at 34:14−35:4, ECF No. 98-1). John Maroulis, Balourdos, Castro, and Gogel decided to go deep sea fishing the next morning. (Id. at 35:18−36:10).

Baloudos and Castro had fished with John Maroulis previously but Gogel had not. (See id. at 21:12−16).

On August 5, 2013, the four men set out early on the Maroulis' boat, the NAUTI CAT, which was a 26-foot catamaran. (Id. at 44:16−20; 54:4−15). They planned to go to Poor Man's Canyon, a popular fishing spot about 70 miles offshore from Ocean City, Maryland. (Id. at 53:3−16). They packed a cooler containing sandwiches, fruit, beer, and other drinks. (Id. at 38:10−39:11). Before leaving, John Maroulis checked the weather forecast, which did not contain a small craft advisory and called for wave heights between three and five feet and wind speeds between ten and fifteen knots. (Id. at 55:4−56:4).

John Maroulis held a 50-ton Master license from the Coast Guard, and he took U.S. Coast Guard safety courses every five years. (Id. At 49:6−50:13). Balourdos did not remember Maroulis giving a safety briefing, and Maroulis did not advise his passengers to put on a life vest. (Id. At 65:11−66:12; Balourdos Dep. At 69:1−71:2, ECF No. 98-2). Life vests were available and visible from the boat's deck but located down a short flight of stairs and through a door in the cabin. (Balourdos Dep. At 75:13−76:2).

Once the group got out to sea, the wind and the waves were slightly rougher than expected, although the weather was "nothing out of the ordinary." (J. Maroulis Dep. At 75:8−15, 90:14−15). A commercial fishing tournament was occurring on that same day, and thus there were several boats of a similar size to the NAUTI CAT out on the water. (See id. at 53:9−13). Around 8:30 a.m, John Maroulis was at the boat's helm and Balourdos, Gogel, and Castro were preparing to cast for fish. (Balourdos Dep. at 77:1−78:5). John Maroulis testified that auto pilot was engaged and that he was looking

straight ahead, watching for lobster pots, and occasionally steering around those pots. (J. Maroulis Dep. at 67:16−68:1). Auto pilot automatically disengaged when he turned the boat. (Id. at 85:15−20). John Maroulis had not drunk any beer that morning, and he did not see any of his passengers drink any either. (Id. at 60:1−11).

Suddenly, a wave hit the boat on the port side, causing it to tip dangerously. (See id. at 67:16−68:11, 89:13−14). John Maroulis characterized it as a rogue wave. (Id. at 89:13−14). Balourdos, realizing the ship was going to capsize, dove into the water. (Balourdos Dep. at 79:1−18). A second wave covered the boat and flipped it. (J. Maroulis Dep. at 68:4−11). John Maroulis was temporarily trapped underneath, but he dove down and resurfaced next to the boat. (Id. at 68:7−14). Balourdos found a floating cooler and he used that and the upside-down boat to stay afloat while Maroulis climbed on the boat. (Balourdos Dep. at 82:21−84:12). About an hour later, John Maroulis and Balourdos were rescued by a nearby boat. (Id. at 85:1−86:18). John Maroulis asked the captain of that boat to take them closer to the NAUTI CAT so that he could search for Gogel and Castro, but the captain refused and Balourdos also advised against it. (Id. at 88:1−12; J. Maroulis Dep. at 70:10-71:6). Gogel and Castro drowned. (See Balourdos Dep. at 98:19−99:6). After Gogel and Castro's deaths, the United States Coast Guard investigated and created a Report ("Coast Guard Report") regarding the incident. (See J. Maroulis Dep. at 73:14-80:14).

## B.    <u>Expert Opinion</u>

Plaintiffs Deborah L. Gogel, Amanda Foti, Candace Gogel, Helen Gogel, Elena Ramos, Thiana Castro, Fredy Ortiz, and Joshua Castro, surviving family members and representatives of the decedents' estates (collectively, "Estate Representatives"),

designated Captain Stephen Motyczka as an expert witness. (Motyczka Expert Report ["Motyczka Rep."] at 2, ECF No. 98-3).

Motyczka owns Westfield Investigative Group, LLC, a company that conducts vessel investigations, and he serves as its principal investigator. (Id. at 20). He is also an instructor and consultant on boating safety and he holds a 100-ton master license Guard Captain from the Coast Guard. (Id.; Motyczka Dep. at 20:18−22:2, ECF No. 98-4). To receive his master license, he spent 360 days at sea and completed other training requirements. (Motyczka Dep. at 20:18−22:2). Previously, Motyczka was a state trooper with the New Jersey State Police Marine Bureau, where he investigated boating accidents. (Motyczka Dep. at 24:2−16). As part of his training with the New Jersey State Police, he attended boat accident investigation school and state police vessel operation school. (Motyczka Aff. ¶¶ 4−6, ECF No. 98-5). He opines that John Maroulis failed to enact proper risk management techniques given the conditions at sea and violated navigation rules. (Motyczka Rep. at 13−17). Specifically, John Maroulis should not have used auto pilot, and his failure to instruct passengers about life vests and storing life vests out of reach was a breach of his duty to passengers. (See id.).

## C.   Procedural History

On July 26, 2016, Estate Representatives filed their Complaint against the Maroulises. (ECF No. 1). They filed an Amended Complaint on May 3, 2018 (ECF No. 18) and a Second Amended Complaint on October 10, 2018 (ECF No. 31). The Maroulises filed an Answer on November 5, 2018. (ECF No. 32). On November 26, 2018, the Maroulises filed a Third-Party Complaint against Garmin International, Inc. (ECF No. 36).

4

Garmin manufactured the navigation system used on the NAUTI CAT. (See Third-Party Compl. ¶¶ 2, 4, ECF No. 36). The Maroulises filed an Amended Third-Party Complaint on March 26, 2019. (ECF No. 48). In the Amended Third-Party Complaint, the Maroulises alleged a design defect, and that Garmin was negligent or careless in failing to warn them that the navigation system could not be used while the boat was in autopilot mode or that particular care was required to use the navigation system while autopilot was engaged. (Am. Third-Party Compl. ¶¶ 10, 13, 17, ECF No. 48). Garmin moved to dismiss the Amended Third-Party Complaint on April 16, 2019 (ECF No. 53), and the Court granted the Motion to Dismiss on October 30, 2019. (ECF No. 65).

On February 17, 2023, the Maroulises filed the instant Motion for Summary Judgment (ECF No. 95). Estate Representatives filed an Opposition on March 16, 2023 (ECF No. 98) and the Maroulises filed a Reply on March 29, 2023. (ECF No. 100).

## II.    DISCUSSION

**A.    <u>Standard of Review</u>**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant "must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial." Sanchez Carrera v. EMD Sales, Inc., 402 F.Supp.3d 128, 144 (D.Md. 2019). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)). A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Fed.R.Civ.P. 56(c)). Thus, summary judgment is warranted if the nonmovant does not provide evidence to establish an essential element of the case. Brocious v. U.S. Steel Corp., 429 F.Supp.3d 82, 86 (D.Md. 2019).

**B.    Analysis**

**1.    Admissibility of Expert Opinion**

The Maroulises first argue that Motyczka, Estate Representatives' expert, is unqualified to provide an opinion in this matter, and that his Report impermissibly relies on the Coast Guard Report. (Mem. Supp. Mot. Dismiss ["Mot."] at 12, ECF No. 95-1). Accordingly, the Court will briefly summarize the rules regarding admissibility of expert testimony.

Rule 104(a) of the Federal Rules of Evidence provides that the Court "must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." This assessment includes a requirement that the Court determine admissibility of expert testimony under Rule 702. McCoy v. Biomet Orthopedics, LLC, No. ELH-12-1436, 2021 WL 252556, at *9 (D.Md. Jan. 25, 2021). The party seeking to present the expert testimony is responsible for establishing its admissibility by a preponderance of the evidence. Id. Here, that party is Estate Representatives.

Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Under the Rule, "a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue, and the testimony is both reliable and relevant." McCoy, 2021 WL 252556, at *10. The Court's "gatekeeping role" requires it to make determinations "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592–93, 597 (1993)).

For evidence to be reliable, "the testimony must be grounded 'in the methods and procedures of science,' and it must be something more than subjective belief or unsupported assumptions." Id. (quoting Daubert, 579 U.S. at 590). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." Id. (quoting Belville v. Ford Motor Co., 919 F.3d 224, 232 (4th Cir. 2019)). Daubert provides the following, non-exhaustive factors for reviewing the reliability of an expert opinion:

> (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review

8

and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.

Id. at *11 (citing Daubert, 509 U.S. at 593–94).

Here, the Maroulises contend that Motyczka lacks sufficient credentials to opine on John Maroulis' alleged negligence and the cause of the accident. (Mot. at 12). Specifically, they argue that Motyczka has never investigated a boating accident like this one—i.e. a catamaran incident resulting in drowning in the Atlantic Ocean. (Id. at 5). The Court disagrees that Motyczka is unqualified, and it finds that his lack of experience investigating this particular type of incident does not bar his testimony. As set forth above, Motyczka has an extensive background in marine accidents and boating safety, and he currently has a 100-ton master license from the Coast Guard. His experience and education allow him to opine on this matter, and the Court finds that his testimony would help a jury to understand the evidence under Rule 702.

The Maroulises also argue that Motyczka's methodology was flawed because he relied in part on the Coast Guard Report. (Mot. at 12). In his deposition, Motyczka admitted that when he prepared his report, he obtained the facts of the incident from the Coast Guard Report, as well as the WeatherWorks report for August 5, 2013. (Motyczka Dep. at 154:3−8). He did not interview anyone associated with the incident, and he did not perform an independent investigation of the NAUTI CAT. (See id.). Estate Representatives contend that Motyczka reviewed the Coast Guard Report "only to obtain background information about the facts of the incident, as the deposition testimony was not yet available." (Opp'n

Mot. Dismiss. at 8, ECF No. 98). Despite Motyczka's admission that he did not review the depositions prior to drafting his Report, the Estate Representatives also argue that Motyczka's Report was permissibly based on the depositions, his experience, the weather report, the Rules of Navigation. (Id.).

Title 46, Section 6308 of the United States Code provides that:

> [N]o part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

While the Fourth Circuit has not discussed the admissibility of marine investigation reports, other district courts have interpreted this statute broadly. (See Deakle v. Westbank Fishing, LLC, 559 F.Supp.3d 522, 529 (E.D.La. 2021) (citing cases and explaining that Coast Guard investigation reports are not admissible for any purpose, including to impeach or refresh a witness' recollections); Am. S.S. Co. v. Hallett Dock Co., No. CIV. 09-2628 MJD/LIB, 2013 WL 308907, at *6 (D.Minn. Jan. 25, 2013) (holding that "the portion of any expert opinion that relies on or is substantially based on the Coast Guard Report is inadmissible, although the rest of the expert opinion is still admissible").

Here, Motyczka has admittedly relied on the Coast Guard Report for factual information, and § 6308 expressly bars the findings of fact from such reports. Motyczka's reliance on the Coast Guard Report has led to at least one incorrect conclusion: Motyczka's Report states that John Maroulis dove off the boat and abandoned ship after the first wave hit, and that he had a duty to the passengers to remain on the boat. (Motyczka Rep. at 15).

To the contrary, the record is clear that it was Balourdos, not John Maroulis, who dove off the NAUTI CAT.

Nevertheless, the Court notes that the issue of the Coast Guard Report's admissibility is not fully briefed, and it is therefore unclear which parts of Motyczka's Report, if any, are admissible. The Maroulises may file a motion in limine on this issue and the Court will rule on that motion, and any other pre-trial motion, at a hearing.

### 2.    Negligence Claim against John Maroulis

The Court now turns to Estate Representatives' negligence claim against John Maroulis. The Maroulises argue that there is no evidence showing any negligence by John Maroulis, and that he is entitled to summary judgment. (Mot. at 14). Estate Representatives counter that John Maroulis was negligent in several ways:

> (1) the sea and weather conditions became unsafe for a small boat, but he did not ask passengers to put on life vests;
> (2) he did not give a safety briefing or explain where life vests were kept;
> (3) life vests were stored out of reach and thus not readily accessible;
> (4) he used auto pilot in dangerous conditions when auto pilot was not advisable; and
> (5) he was looking straight ahead for lobster pots and not paying attention to wave formation.

(Opp'n at 9−10). Estate Representatives posit that there is a genuine dispute of material fact as to whether John Maroulis was negligent in these respects. (See id.). Although it is a close question, the Court agrees with the Estate Representatives.

In order to establish a claim of negligence under maritime law, a claimant must show each of the following elements by a preponderance of evidence: duty, breach,

causation, and damages. <u>Dann Marine Towing, LC v. Gen. Ship Repair Corp.</u>, No. MJG-12-1610, 2017 WL 3916992, at *13 (D.Md. Sept. 7, 2017).

The Court emphasizes that its role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Allstate Ins. Co. v. Rochkind</u>, 381 F.Supp.3d 488, 507 (D.Md. 2019) (quoting <u>Anderson</u>, 477 U.S. at 249). In this instance, there is sufficient evidence to create a genuine issue for trial as to John Maroulis' negligence. A reasonable jury could hear testimony from John Maroulis and Balourdos and conclude that life vests were not readily accessible and that John Maroulis did not provide adequate safety instructions.

The Maroulises argue that there is no genuine dispute of material fact regarding the life vests because there is no evidence of causation. (Mot. at 12−13). Specifically, the Maroulises claim that because Gogel and Castro's bodies were recovered from the cabin of the NAUTI CAT, life vests would have made no difference because Gogel and Castro were trapped inside and could not have reached the surface even if they wore life vests. (<u>Id</u>.). This argument is unconvincing because the only evidence stating where Gogel and Castro were found comes from the inadmissible Coast Guard Report. Thus, a jury could not consider this fact, and a reasonable fact-finder could conclude that a life vest would have saved Gogel and Castro's lives.[1]

---

[1] The Court makes no determination at this point in the litigation whether evidence of Gogel and Castro's location after the accident can be proven from sources other than the Coast Guard Report. Regardless, their location would remain a fact-finding decision.

Accordingly, the Court will deny the Motion for Summary Judgment as to John Maroulis.

### 3.    Negligence Claim against Paula Maroulis

Finally, the Court turns to Estate Representatives' negligence claim against Paula Maroulis. The Maroulises argue that Paula Maroulis was not present on the day of the incident, and therefore there is no evidence of negligence on her part. (Mot. at 21). Estate Representatives contend that Paula Maroulis can be held vicariously liable for her husband's negligence because she was a co-owner of the NAUTI CAT and she was present at dinner with Gogel and Castro the night before the incident. (Opp'n at 14−15). At bottom, the Court agrees with the Maroulises.

Estate Representatives claim that "common law rules of negligence apply in admiralty law" and therefore the Maroulises' relationship as co-owners of the boat imposed a duty on Paula Maroulis to ensure that John Maroulis afforded a reasonable standard of care to passengers. (Opp'n at 15). In support of this argument, Estate Representatives cite Smith v. Mitlof, 130 F.Supp.2d 578 (S.D.N.Y. 2001), where the District Court for the Southern District of New York found that a negligence claim could proceed against defendant boat-owner even though he was not present at the time of the accident. Id. at 583. Importantly, the court explained that there was strong evidence of the defendant's negligence, and that he knew or should have known of an "intolerable risk" to passengers. Id. (describing defendant's failure to have his boat inspected, as required by statute, and his knowledge that the boat could not safely carry more than a few passengers without taking on water).

Here, there is no evidence whatsoever that Paula Maroulis knew or should have known of any risk to Gogel or Castro. Her presence at dinner the previous evening does not establish that she had knowledge of the weather, the water conditions, where her husband kept the life vests, his failure to give a safety briefing, or his failure to ask passengers to wear a life vest. Accordingly, the Court will grant the Motion to for Summary Judgment as to the claims against Paula Maroulis.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Maroulises' Motion for Summary Judgment (ECF No. 95). The Motion will be granted as to the claims against Paula Maroulis and denied in all other respects. A separate Order follows.

Entered this 29th day of August, 2023.

_____/s/_____

George L. Russell, III
United States District Judge
